**S. AMANDA MARSHALL, OSB #95347**
United States Attorney
District of Oregon
**JENNIFER J. MARTIN, OSB #84285**
e-mail:  jennifer.martin@usdoj.gov
**JOHNATHAN S. HAUB, OSB #76165**
e-mail:  john.haub@usdoj.gov
**ANNEMARIE SGARLATA, OSB #065061**
e-mail:  annemarie.sgarlata@usdoj.gov
Assistant United States Attorneys
1000 S.W. Third Ave., Suite 600
Portland, OR  97204
Telephone:  (503) 727-1000
Facsimile:  (503) 717-1117
Attorneys for United States of America

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 3:13-CR-00596-JO** |
| v. | **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT HAGEN'S MOTION FOR PRETRIAL RELEASE** |
| **JASON WELD HAGEN,** | |
| **Defendant.** | |

The United States of America, by S. Amanda Marshall, United States Attorney for the

District of Oregon, and Jennifer J. Martin, Johnathan S. Haub and AnneMarie Sgarlata, Assistant

United States Attorneys, opposes defendant Hagen's motion for release from pretrial custody on

the grounds that he is a flight risk and that his release would pose a significant danger to the

community.  Further, he fails to meet his burden to provide the Court with information that was

unknown to him at the time of the last hearing that would overcome the statutory presumption of

detention.  A separate exhibit list will be filed, with a disc and/or notebook of exhibits provided

to counsel and the court.

## I.    SUMMARY OF ARGUMENT RELEVANT TO DETENTION HEARING

Defendant has remained in custody since his initial appearance and contested detention hearing on December 18, 2013 when Magistrate Judge Acosta ordered him detained as a flight risk.  Defendant is charged with drug trafficking and exporting offenses for conducting thousands of illegal drug transactions over the internet and through the mails with drug purchasers in the United States, Canada, Australia, Italy, the Czech Republic and elsewhere. He is charged with money laundering offenses for laundering hundreds of thousands of dollars of drug proceeds by converting the customers' online payments of the virtual currency, including Bitcoins, into traditional currency through bank accounts, reloadable and stored value cards, money orders and Western Union wire transfers.

Agents have documented defendant's systematic and sophisticated use of other identities to disguise his participation in criminal activities, and to conceal his location from others.

For example, in early March, 2013, defendant Hagen opened a U.S. bank account using a false Oregon driver's license in the name "Kevin Michael Shields" with an address in Portland, Oregon.   See Exhibit 1. Defendant Hagen gave bank officials a different residential address in Washington. The address he gave the bank officials as his residential address is a P.O. Box address at a nearby UPS facility, which defendant opened using the false Oregon driver's license and an American Express card in the name Kevin Shields as identification.  He was photographed using the account. See Exhibit 2.

Agents observed defendant Hagen use different false identification to mail a parcel containing methamphetamine on June 3, 2013.

In August of 2013, defendant admitted using false identification in a recorded conversation with a federal fugitive he helped conceal from law enforcement.  He expressed his lack of concern about being caught with false identification.

On December 17, 2013, agents seized identification,  prepaid cards, Equifax reports, vehicle applications, mail for prepaid cards, typewritten notes with personal identifications numbers such as social security numbers, dates of birth, salaries, and other key information for more than 65 individuals from the residence where defendant was living with his girlfriend. Agents found evidence confirming that defendant improperly uses his ability to access personal information through Equifax to fraudulently use other individual's identities in mailing packages, setting up bank accounts, stored value cards and creating false identification.   They found evidence that defendant has additional identities stored in encrypted accounts on the internet, and he could use to create additional identity documents, create bank accounts and obtain prepaid debit cards, wire transfers, and otherwise access unrecovered assets that remain at his disposal.

Defendant Hagen's told the Pretrial Services Officer that he was a private investigator, corroborating his knowledge, access and ability to obtain credit reports in the names of others.

Agents found evidence that defendant has assets and bank accounts in the United States and abroad.  Defendant maintains unknown assets under other names, and needs only to access the internet in order to tap into false identification and assets that he holds, and flee from prosecution.

**A.  Defendant's Concealment of a Federal Fugitive and Use of False Identification.**

On February 26, 2013, defendant Hagen used the identity of a federal fugitive to renew a P.O. Box.  The federal fugitive was a co-conspirator hiding in Billings, Montana using the name

**Government's Opposition to Defendant Hagen's Motion for Release**          **Page** 3

Eli Levine.  Defendant Hagen used the federal fugitive's true name to receive shipment of methamphetamine at the P.O. Box.    He also used the P.O. Box to receive and forward packages to the federal fugitive in Montana, assisting the fugitive to elude law enforcement.

Deputy United States Marshal (DUSM) Rakoz learned that on March 7, 2013, defendant Hagen, again using the fugitive's name, picked up a package from China addressed to the fugitive.  On March 11, 2013, task force officers saw defendant Hagen carrying three packages from the fugitive felon's P.O. Box.

Oregon State Police Detective Edelbrock contacted defendant Hagen, who denied being the fugitive and presented a false Oregon driver's license bearing defendant Hagen's photograph and the name "Kevin Shields."  He also had a Visa debit card and an American Express card in the "Kevin Shields" name.  See Exhibit 3.

During a consensual search of his vehicle, agents found a $2,000 Western Union money transfer from Cambodia to "Kevin Shields," which defendant cashed at the U.S. bank account he established in the "Kevin Shields" name.

Defendant Hagen initially denied knowing the fugitive, and then denied knowing the fugitive's location.  However, DUSM Rakoz found a FedEx receipt showing that on March 9, 2013, defendant mailed a package to "Eli Levine" in Montana.  Defendant Hagen ultimately admitted that he sent this package to the fugitive in Billings, Montana.  He admitted that he also intended to send the three packages from the fugitive's P.O. Box to the fugitive.  One package contained $250 cash and a thank you note, another contained $1,000 cash, and the third contained 500 ephedrine pills from India.  See Exhibit 4.

**B.  Defendant Warned a Federal Fugitive about Imminent Apprehension.**

Immediately after defendant Hagen was released, he warned the fugitive that law enforcement officers knew where he was and planned to arrest him.  As a result, the fugitive fled again, leaving behind some personal belongings in the hotel.  The federal fugitive was arrested the following day, on March 12, 2013 when he returned for his belongings, after hotel staff advised him that they would not release his belongings to a third party.

When he was arrested, the federal fugitive was in possession of a FedEx package containing methamphetamine, carbon filter particles and shrink wrapped plastic.  These materials are consistent with the materials defendant Hagen uses in shipping methamphetamine.

**C.  Additional Evidence of Defendant's Creation and Use of False Oregon Driver's
    Licenses Identification.**

On March 13, 2013, law enforcement officers found 14 false Oregon driver's licenses with defendant Hagen's photograph in various stages of production in a search warrant at an associate's residence.   The associate identified the materials for making the false identification as co-defendant Bechen's equipment to make false identification.   Four of the false driver's licenses with defendant's photograph had identifying information.  Others were blank and ready for false names and addresses to be added. See Exhibit 5.

**D.  Recorded Conversation between Defendant and Former Fugitive about the Use
    of False Identification, and other Criminal Conduct.**

The federal fugitive appeared in federal court and was released pending the resolution of his case.  The fugitive agreed to record a conversation with defendant Hagen on August 22, 2013.  A complete transcript of the recorded conversation is attached as Exhibit 6.  During the conversation, the two men discussed:

- **Defendant's use of false identification in his contact with the USMS.**

   *I always switch wallets after I do a pick up for Western Union I always switch your know but I didn't switch back so when they got me next to the car they have the fake ID on my I had the fake ID on me (sic)*

- **Defendant's use of a phone tree to warn the fugitive that law enforcement knew where he was:**

   *But I have a choice here I can either be held and go to prison for saying nothing or I can risk getting out of here and being in a position to initiate a call tree to get back to you. Did you get the call?*

- **Defendant's routine use of false and stolen identities to open bank accounts.**

- **Defendant's use of false and stolen identities to pick up Western Union money transfers.**

- **Defendant's use of P.O. Boxes in other people's names.**

- **Defendant's assistance in getting a false identity used to title a Cadillac CTS for the fugitive's use while evading law enforcement.**

The transcript documents defendant Hagen's lack of concern about being arrested with false identification, and his willingness to assist a federal fugitive.

### E.  Defendant's Use of False Identification in Mailing a Parcel Containing Methamphetamine.

On June 3, 2013, surveillance officers saw defendant Hagen deposit more than a dozen large envelopes or packages into exterior and interior mail boxes at a Vancouver Post Office, before driving to the Shilo Inn, where he parked next to co-defendant Reder's truck.

**Government's Opposition to Defendant Hagen's Motion for Release          Page 6**

The US postal inspector identified 14 parcels that defendant dropped into the mailbox inside the post office.  All 14 were priority envelopes with the same fictitious Wilsonville, Oregon return address.  A trained narcotics detection canine alerted to the odor of narcotics from a parcel addressed to "John Henry" in Los Angeles, CA.  Agents obtained a search warrant and found the parcel contained a DVD concealing methamphetamine.  They photographed various stages of opening the parcel defendant Hagen mailed.  See Exhibit 7.

### F.  Defendant's use of Co-conspirators and Others to Mail Parcels Containing Methamphetamine.

Surveillance officers learned that a co-defendant would obtain parcels at defendant's residence for shipping.

On July 11, 2013, agents observed co-defendant Chelsea Reder take a duffle bag into defendant's residence.  She returned to her truck a short time later with the duffle full of packages.  The co-defendant mailed the parcels, and agents recovered them.   The packages were addressed to locations in Australia and in the United States.    The four packages each contained approximately 35 grams of methamphetamine heat-sealed in Food-saver type packaging, with a second layer of charcoal grains, all wrapped inside of a folded Ziploc bag covered in metallic Mylar paper.  Agents photographed the four parcels. See Exhibit 8.

On December 17, 2013, defendant Hagen's half-sister Jessica Bailey, told HSI Special Agent Erin Burke that defendant Hagen asked her to mail approximately 10 packages in the two weeks before the interview.  Defendant Hagen told her they were Christmas presents.  She told Special Agent Burke that the packages were open, and she looked inside and found a movie and a cell phone.  As seen above, on June 3, 2013, defendant Hagen mailed methamphetamine concealed inside the packaging of DVD, consistent with the packages he provided to Ms. Bailey.

**Government's Opposition to Defendant Hagen's Motion for Release        Page** 7

He also tried to convince her to open an online account.

December 17, 2013, defendant Hagen's sister, Stephanie Hagen told Special Agent Burke that she had an idea that defendant Hagen was involved in doing something illegal, but he did not specifically tell her what he was doing.

### G.  Evidence of Stolen Identities and Money Laundering at Defendant's Residence.

While executing search warrants at Defendant's residence in December 2013, agents found evidence corroborating Defendant's account of his extensive and routine use of false or stolen identities.  Evidence from the search warrants, arrests, and grand jury records show defendant Hagen has obtained over 60 different identities and has access to over 200 email addresses that he has used for illegal money laundering and drug trafficking purposes.  Evidence seized at the search warrant includes:

- 12 disposable phones with attached notes displaying initials.  The initials matched the initial for the names on 12 prepaid debit and credit cards seized during the execution of a search warrant on co-defendant Chelsea Reder's residence;

- 53 names with personally identifying information (PII) attached;

- a Net Bank Prepaid card in co-defendant Donald Bechen's name;

- Notes of social security numbers, dates of birth, salaries, and occupations;

- Equifax credit reports in the names of other people;

- Loan applications in the names of other people;

**Government's Opposition to Defendant Hagen's Motion for Release**      **Page** 8

- Copies of driver's licenses in the names of other people;

- A list of more than 60 bank accounts in the names of other people;

- Prepaid debit cards in the names of other people;

- Prepaid Green Dot cards;

- Credit cards in the names of others;

- Two American Express Prepaid Bluebird cards with no associated name;

- Two Paypower cards with no associated name;

- A Columbia State bank account in the defendant's true name;

- A Zions bank account in the defendant's own name;

- A Bank of American account with no associated name;

- A PayPal account in the defendant's own name;

- A hand-written notebook (Exhibit 13)containing dates and "to-do" lists including entries about:
  - an ID Scan[1] Scanshell 800 or 1000 "to scan 2D bar codes". Exh 13 at p. 3

---

[1] A Scanshell OCR has the ability to scan driver licenses and passports, and extracts the textual information from the driver license or passport image into external file, clipboard, or third party software at a rate of 4 seconds per card.

**Government's Opposition to Defendant Hagen's Motion for Release**          **Page** 9

- o Obtaining passport pictures, copies of driver's licenses, and driver's license profiles.  Id. at pp. 8, 11, 15.
- o The use of pre-paid stored valued and reloadable credit cards.  Id. at p.1, 8, 10.
- o Using Bitcoin virtual currency to transfer money.  Id. at p.5, 13, 15.
- o Opening, closing, depositing funds into, and using various bank accounts at Chase, USAA, and Wells Fargo.  Id. at p. 2, 3, 4 7, 8, 13, 15, 16, 17, 18, 19, 21.
- o Using burner aka "throw-away" cellular phones.  Id. at p. 9, 10, 16, 17, 19, 20.
- o Shipping packages and using packaging materials.  Id. at p. 2, 3, 5, 6, 7, 9, 11, 14, 17, 19, 21.
- o Using P.O. Boxes and mail drops at UPS stores.  Id. at p. 3, 16, 17, 20.
- o Meeting with tax attorneys and accountants about "judgment-proof" investments. Id. at p.1, 20.

Defendant's notebook also contains references to three different sets of identities: height and weight information and identifiers typically included on driver's licenses, such as hair and eye colors.  One of the three identities was Samuel Edward Evard, one of the multiple identities used by the federal fugitive before his arrest on March 12, 2013.

## II.    LEGAL ARGUMENT

### A.    Defendant Presents an Exceptionally Heightened Risk of Flight.

Detention is appropriate where the government establishes by a preponderance of the evidence that a defendant presents an unmitigated risk of flight.  *See United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).  To re-open a detention hearing, a court must find that information exists that was not known to a defendant at the time of the initial hearing.  18 U.S.C. § 3142(g). The information must also have a material bearing on the issue whether there are conditions of release that will reasonably assure his appearance as required and the safety of the community.  18 U.S.C. § 3142(f)(2).

Here, the overwhelming weight of the evidence supports Magistrate Judge Acosta's finding that defendant Hagen presents a heightened risk of flight that no condition or combination of conditions can mitigate. Defendant proffers nothing new to the contrary. What he does offer has no material bearing on the conditions analysis. Defendant's continued detention is warranted.

1.    **Defendant has the motivation to flee.**

Defendant faces two counts that each carry a ten-year mandatory minimum and maximum Life sentence for drug trafficking. Congress codified the common-sense notion that someone facing a ten year mandatory minimum prison sentence with the possibility of a life sentence is presumed very motivated to flee prosecution. 18 U.S.C. § 3142(e)(3)(A). This presumption is particularly compelling here, where defendant Hagen was recorded speaking with the fugitive felon assisted in fleeing federal charges. Exhibit 6. It is consistent with defendant's preparation in obtaining false identities and bank accounts, prepaid cards and virtual currency. It is consistent with his criminal conduct as Hammertime, instructing others on how to communicate via heavily-encrypted internet messages routed through a network designed to anonymize identities and locations, and lying to law enforcement. It is also consistent with writings found on the Silk Road servers, in which "Hammertime" communicates with an individual operating a screen-name that the fugitive identified as his own, and articulating in communications with methamphetamine customers a well-considered and researched plan to flee in the event he faced criminal charges.

Where the statutory presumption for detention applies, a defendant must overcome it with favorable information about the nature and circumstances of the offense, the weight of the

evidence, history and characteristics and the nature and seriousness of the danger to the community posed by release.  18 U.S.C. § 3142(g).  Defendant presents no information sufficiently compelling to rebut the presumption, and what he does present was, by its very nature, known to him at the time Magistrate Judge Acosta detained him.

      2.    **Defendant has the means to flee.**

Defendant Hagen has used and is willing and able to steal or create false identities and credit cards necessary to travel.  In addition to the technical know-how and means to generate and use false identification, the preponderance of the evidence informs the court that the defendant has the means to flee.

Agents seized evidence that defendant Hagen has bank accounts in the United States, Mexico and Poland.  He admitted as much to the Pretrial Services Officer. A Visa Check Card issued from Bank Zachodni in Poland was found in his residence during the search warrants, along with a ledger referencing a Polish bank account used for the anonymous conversions of Bitcoin to cash. Documents seized in the search warrant include information  that the Polish bank-issued Visa card can be registered online using "fake polish information" that is not verified with no picture identification required; that it can be used at any ATM worldwide that deals in that currency and that accepts Visa; that the individual or entity that provided the Polish Visa card to Defendant also provides cards that work in Canada, just north of Defendant's proposed residential placement; and that the cards can be tied to a Polish PayPal account that accepts deposits with "mismatched" names.

Agents also found evidence of a foreign Banco Azteca account in the defendant's name. In a December 17, 2013 interview, defendant's step-sister told agents that defendant Hagen

**Government's Opposition to Defendant Hagen's Motion for Release**     **Page** 12

opened a bank account Defendant in her name during a recent visit to Mexico, without her prior knowledge.  As noted earlier, agents found information pertaining to dozens of bank accounts in other names in evidence seized from his residence.

Finally, information seized from the Silk Road servers shows that defendant earned over $600,000 last year selling methamphetamine via the internet, and that his proceeds were in the form of Bitcoin virtual currency.  Bitcoin, by design, can be accessed and liquidated via the internet from virtually anywhere in the world and is nearly impossible to locate and seize without the precise alphanumeric password known only to the Bitcoin owner.

Defendant's associate, Ms. Greiner told agents  that defendant Hagen recently told her about another digital currency called Ripples, and about his Ripples accounts.

> **3.    Defendant has access to false identities stored in an encrypted network in the cloud.**

Forensic analysis of defendant Hagen's computer shows defendant stored files on 12 identities stored in an encrypted cloud on SpiderOak.

The use of encrypted devices in the cloud to store such information is of particular concern, because it can be accessed from anywhere, including secured and unsecured wireless internet networks in residences, coffee shops, and other business establishments, or through the use of Wi-Fi thumb drives such as the thumb drives seized from Defendant's residence during the search warrants, which can be used as personal, portable hotspots with virtually untraceable IP addresses. Defendant can access his Cloud-based accounts without a trace, from virtually any location and used them to manufacture identities, buy airplane tickets, obtain travel documents,

and disappear right out from under the supervision of Pretrial Services, the Court, or any proposed residential placement of defendant Hagen with relatives or in the community.

Defendant has the incentive, the means, the practice and the motivation to continue using and creating false identities that can be used to access and liquidate assets in other people's names.  If  release pending trial, he will also have the opportunity to use the skills at his disposal for a more compelling purpose than he ever has before - to effectuate his long-considered plan of fleeing from justice at the prospect of a long federal sentence of imprisonment.

**III.     Defendant Fails To Rebut The Presumption Of Detention.**

The court should note that Defendant Hagen's accomplishments, while commendable[2] are all very dated, and provide no recent information to the court about his past employment for the past 7 years or his stability.  Defendant provides this court with no significant verifiable information about his conduct after 2006, in contrast to the exhibits the government presents about his more recent recorded statements, possessions and actions.  The dated accomplishments do not support a finding that conditions will overcome his urge to flee, or his continuing criminal conduct. Significantly, defendant provides no recent evidence that defendant has done anything other than hide his identity and his assets.

Tellingly, when defendant Hagen was interviewed by pretrial services prior to his initial detention hearing, he gave his address as 16203 N. E. 36th Ave., Ridgefield, WA. This is the address his parents previously owned, but defendant did not live there.  He was living with Ms.

---

[2] Defendant's motion notes that he was an Eagle Scout, successfully attained the highest level of education in his chosen field, taught at university, was published in a peer-reviewed journal, and maintained his physical fitness.  He also represents that he provided nursing care for Ms. Schei.

Schei, although he could not provide the pretrial interviewer with her address.  He claimed stayed sometimes with his girlfriend but otherwise lived at the northeast 36th Avenue address. Defendant's own mother corrected his misstatements and advised that he lived with his girlfriend and not at the 36th Avenue address. Defendant's motion now claims he has lived with her for five years, making his misrepresentations to the Pretrial Services officer more significant.  This court should be concerned about the misrepresentations and defendant Hagen's propensity to title assets, utility bills, property and vehicles in names other than his own.

Finally, information about his family, their locations, his own education, Boy Scout membership and ties to the community is not information sufficient to re-open the detention hearing because it is not information "that was not known to the defendant at the time of the detention hearing" within the meaning of section 3142(f)(2).  Accordingly, it cannot support the finding necessary to re-open the detention hearing or reverse Magistrate Judge Acosta's order.

      **1.     Defendant's Proposed Places of Employment are Calculated to Provide Him with Access to the Internet, where defendants maintains additional false identities and assets.**

In a recent jail call with his father, defendant made a point of asking if he could access a computer.  Exh. 10.

> *Defendant:     Is there a spot there somewhere where I can have a computer and a desk?*

> *Defendant father:     Yes.*

> *Defendant:     Somewhere in there?*

> *Defendant's father:     Yeah, sure.*

> *Defendant:     O.K.  Well then, I'm golden.*

**Government's Opposition to Defendant Hagen's Motion for Release**     **Page** 15

If defendant Hagen is released from custody, he will again have access to false identities and drug proceeds. The government's concern that he will flee to avoid prosecution is justified in view of defendant's use of false identification to conceal a federal fugitive, conduct drug trafficking and engage in money laundering.

Defendant's proposal to look for an adjunct teaching job presents the same concern. An educational facility would provide him with access to the internet, his false identities and assets.

> **2.    Defendant's Proposed Residences Are Inappropriate, as the individuals at each proposed residence knew of his illegal conduct and failed to take steps to prevent or report it.**

Evidence from the search warrants and jail tapes compel the conclusion that Defendant cannot be successfully supervised by his nominees. Evidence from the search warrants disputes Hagen's suggestion that the residences of his girlfriend or members of his family constitute a suitable placement in the community that would help to ensure his appearance at every court hearing as ordered.

> **a. Defendant's Proposed Residence with Stephanie Hagen is inappropriate as she was aware he was involved in illegal activity before his arrest, and took no action to stop it.**

On December 17, 2013, Stephanie Hagen told Special Agent Burke that she had an idea that defendant Hagen was involved in doing something illegal, but he did not specifically tell her what he was doing. Defendant provides no basis for this court to conclude that she would take any action to stop illegal activity or ensure his appearance at court. Her tolerance of his illegal activity does not justify his release to her residence, nor does it bring a guarantee that he will appear or refrain from additional criminal activity.

**b. Defendant's Proposed Residence with Rondi Schei is inappropriate as she was aware he was involved in illegal activity before his arrest, and took no action to stop it.**

Defendant cannot be supervised effectively by the same individuals he lived and visited with while mailing packages of methamphetamine, amassing large quantities of personal identity information belonging to other people, possessing drugs and drug packaging materials, using and displaying 12 different cell phones to transact illegal drug sales in plain sight in their home. There is no doubt that Professor Schei was aware of his illegal activity. Professor Rondi Schei's journal, seized in the search warrant at Hagen's residence contains a May 17, 2013 entry stating:

> "Life is good, but so very dramatic. Jason is upset with me because he feels that I would "leave" him if he were arrested and sent to jail. That may be true. I can't predict what I may decide is best for me. But the fact remains that he would be the one leaving me. He is the one who made the choices that could remove him from my life. The risk he absorbs, he feels is worth the loss of our relationship. Why else would he make the decisions…"
> Exhibit 11.

Clearly, Professor Schei knew Defendant was engaged in criminal conduct and their home was brimming with evidence of identity theft, forgery, drug trafficking, and money laundering. Her tolerance of his illegal activity does not justify his release to her residence, nor does it bring a guarantee that he will appear or refrain from additional criminal activity.

## IV.    DEFENDANT IS A DANGER TO THE COMMUNITY

Defendant should also be detained as a danger to the community, which the government must establish by clear and convincing evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

The degree of danger posed by a defendant charged with narcotics trafficking is critical. *United States v. Leon,* 766 F.2d 77, 81 (2nd. Cir. 1985). To determine that degree and decide if it supports that statutory presumption of detention , a judicial officer must look to the nature and circumstances of the crime charged; whether the crime involved violence or drugs; the personal history of the person, the seriousness of the danger posed by the person's release, and the evidence of the individual's guilt. *Id.* Evidence of defendant's family relations, residence in the community and employment history have no bearing on the court's determination of dangerousness and cannot rebut the presumption that arises under the statute. See S. Rep. No. 225, 98th Cong., 1st Sess. 24 (1983) (minimizing community ties and pointing to the "growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance, and has no correlation with the question of the safety of the community."). Yet, this is the only evidence Defendant offers in support of his motion to re-open the detention hearing. Meanwhile, abundant evidence in the record, combined with the statutory presumption that Defendant fails to rebut, clearly and convincingly support the conclusion that Defendant presents a risk of danger to the community that cannot be mitigated by conditions.

### 1.    Defendant is a safety risk to the community

Concern about the safety of the community is not limited to concerns about violence, but rather, as Congress noted, even the risk that a defendant will once again continue their criminal activities while on release warrants continued detention as a danger to the community:

[T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concerns about safety be given a broader construction than merely danger of harm involving physical violence. This principal was recently endorsed in *United States v. Provenzano and Andretta* (citations omitted in original), in which it was held that the concept of 'danger' . . . extended to nonphysical harms such as corrupting a union. The committee also

**Government's Opposition to Defendant Hagen's Motion for Release**        **Page** 18

emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the 'safety of any other person or the community.'

*S.Rep. No. 98-225, 98th Cong., 1st Sess.* (1983), reprinted in 1984 U.S.C.C.A.N 3182, 3195 (Bail Reform Act)(emphasis added); *see also United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir.1989)(Congress has determined "that drug offenders pose a special risk of flight and dangerousness to society.").   Here, the grand jury found probable cause existed to show that Defendant distributed over 17 pounds of methamphetamine.  His source of supply has not been brought to justice.  At the search warrant, his vehicle contained almost $200 worth of typical drug distribution packaging materials like those used in the seized packages.  Yet, no drugs were found in the search warrants.  These facts converge on the conclusion that Defendant, if released, will have access to a sizable quantity of methamphetamine, which can be sold throughout the community for cash or virtual currency that Defendant can use to flee.

The evidence cited at length above concerning Defendant's access to and possession of stolen identities stored in the Cloud, and his accumulation of undisclosed financial resources including in the form of untraceable digital currency, all support that he poses a substantial danger to the community, both by his involvement in the distribution of methamphetamine, and by his use of stolen identities.

### 2.    The nature and circumstances of the crimes charged

Defendant is charged with offenses involving drug trafficking and money laundering. Part of the methods he used in committing these offenses was the creation and use of false identities and false identification.  The nature and circumstances of the crime were set forth in the government's previously filed Motion for Pre-Trial Detention, which is incorporated by this

reference,  as well as the record of the detention hearing conducted before The Honorable John V. Acosta on December 18, 2013. See Exhibit 12.

### 3.    The weight of the evidence against the defendant

There is ample evidence that defendant conspired with others to distribute methamphetamine, and to launder money. This is supported by surveillance officers watching defendant Hagen mail parcels of methamphetamine, surveillance of defendant Hagen providing parcels containing methamphetamine to co-defendant Reder to mail, false identities and packaging materials found in defendant's vehicle.

In addition there is ample evidence that defendant is "Hammertime", in view of the timing of the shipments, and the numerous references to "SR" in Defendant's journal along with references to Green Dot, stored value, and reloadable debit and credit cards, bank accounts, and references to packing materials, PO Boxes, USPS and UPS.

### 4.    The seriousness of the danger posed by release

Defendant Hagen's past conduct and lack of known employment or any legitimate income are cause for serious concern for his criminal conduct, as are his access to false identities and financial resources.

## V.    CONCLUSION

Defendant is charged with offenses that trigger a rebuttable presumption that no condition or combination of conditions of release will reasonably assure his appearance as required and the safety of the community.  *See* 18 U.S.C. § 3142(e).  In the initial hearing the magistrate judge found that defendant did not overcome the statutory presumption that he was a flight risk.

**Government's Opposition to Defendant Hagen's Motion for Release        Page** 20

Additional evidence not before the court in the detention hearing reinforces that finding, and this court should reach the same conclusion. This court should also find that based upon the additional evidence, defendant Hagen poses a danger to the community.

Finally, the court should find that defendant has failed to rebut the presumption of detention. Defendant offers no basis for this court to conclude that supervision would be effective as a barrier between defendant and additional criminal conduct or flight. In fact, in a recent intercepted telephone call, defendant's sole concern in obtaining a job with his father is that he have access to "a computer and a desk" – which is all defendant Hagen needs to access his Cloud-based stolen identities, virtual assets and financial accounts to continue his criminal conduct and to flee the jurisdiction just like the fugitive he helped to conceal.

Defendant Hagen is a man who has considered, planned, and rehearsed plans to make and use false identities to avoid being held responsible for his drug trafficking and other illegal activities.

///

///

///

///

///

///

///

///

///

**Government's Opposition to Defendant Hagen's Motion for Release**      **Page** 21

For the foregoing reasons, the government moves this Court to detain defendant Hagen pending trial as there is no combination of conditions that will likely both protect the community from his criminal proclivities or to keep him from fleeing before these charges can be adjudicated.

Dated this 18th day of February, 2014.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

*s/Jennifer J. Martin*
JENNIFER J. MARTIN
*s/John S. Haub*
JOHN S. HAUB
*s/AnneMarie Sgarlata*
ANNEMARIE SGARLATA
Assistant United States Attorneys

**Government's Opposition to Defendant Hagen's Motion for Release**          **Page** 22